**IN THE UNITED STATE DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **CHANTELLE MARIA MARLER,** | § | |
| **INDIVIDUALLY, AND** | § | |
| **ON BEHALF OF HER MINOR** | § | |
| **CHILD, H.L.M.** | § | |
| | § | **CIVIL ACTION** |
| **Plaintiffs,** | § | **NO. 1:22-CV-02460** |
| | § | **(JURY DEMANDED)** |
| **VS.** | § | |
| | § | **JUDGE TERRY A. DOUGHTY** |
| **SHERIFF MARK WOOD,** | § | |
| **RPSO DEPS. JOHN/JANE DOES 1-10,** | § | **MAGISTRATE JOSEPH H.L.** |
| **UNKNOWN MEDICAL SERVICE** | § | **PEREZ-MONTES** |
| **PROVIDER,** | § | |
| **MEDICAL STAFF MEMBERS** | § | |
| **JOHN/JANE DOES 11-20** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Chantelle Maria Marler, Ind., and on behalf of her minor child, H.L.M. submits the following Memorandum in Opposition to Defendants' Motion for Summary Judgment.

**INTRODUCTION**

The right to be free from unreasonably dangerous conditions of confinement that impose a substantial risk of harm and the right for serious medical needs to be met with more than deliberated indifference are fundamental rights guaranteed by the Fourteenth Amendment of the United States Constitution. Plaintiff, on behalf of her dead husband Jason Marler, has sufficiently alleged that Defendant Sheriff Mark Wook violated Jason Marler's constitutional right when he allowed opioids, namely Fentanyl, to continue to be transported within his facility without taking reasonable steps to address the obviously dangerous problem. Plaintiff asserted that Sheriff Wood's deliberate indifference, in conjunction with the negligence of his deputies, caused Jason Marler to

1

die from an overdose on August 11, 2021. Defendants now move for summary judgment on Mrs. Marler's constitutional claims pursuant to 42 U.S.C. § 1983 and for Plaintiff's state law negligence claims. As will be set forth in this memorandum, Plaintiff has sufficient evidence to prove genuine issues of material facts exist as to all claims against Sheriff Woof and his deputy. As such, Defendant's motion should be denied.

## **FACTUAL BACKGROUND**

I.  **Sheriff Mark Wood implemented a search policy that was shown to be ineffective and inadequate and resulted in several incidents of suspected overdoses before Mr. Marler's incident and death on August 11, 2021.**

Sheriff Mark Wood took office as the Rapides Parish Sheriff on July 1, 2020. [Def. Mtn. Sum. Jdmt., Exhibit 4, ¶ 1. As Sheriff, Mr. Wood was the final policy maker and was responsible for implementing the policies and procedures for the Rapides Parish Detention Center. [Exhibit A, Deposition of Bradley Salard, p. 17:23 – 18:-5]. Sheriff Wood implemented a policy and custom at RPDC that deputies did not search inmates every time they were moving inside of the facility from one living area to another, but to only conduct a search when the deputies suspect that the inmate "has something." [Exhibit A, Deposition of Bradley Salard, pp. 23:12 – 24:1].

Prior to the subject incident of this matter and while the policy to only search upon suspicion of contraband was in effect, Sheriff Wood knew that a "significant percentage" of inmates in his facility were addicted to drugs. Exhibit C, (RPSO/CDP&P 93-94, RPDC Policies and Procedures: H-2200 Health Care Medically Supervised Withdrawal and Treatment,). He and his deputies knew that Fentanyl was dangerous, that inmates would try to smuggle fentanyl into their facility, and that fentanyl could cause an overdose if ingested. [Exhibit A, Deposition of Bradley Salard, p. 16:4 – 18:5; Exhibit B, Deposition of Matthew Dubois, p. 27:5-19, 34:19-22]. The RPDC deputies, and surely Sheriff Wood, also knew that inmates would attempt to transport

contraband, including drugs, from one living area to another. [Exhibit B, Deposition of Matthew Dubois, p. 50:9-13].

Prior to Jason Marler's overdose that gave rise to this litigation, it was known that opioid overdoses were an issue that required the facility to keep Narcan available. [Exhibit A, Deposition of Bradley Salard, p. 43:22 – 44:5]. Indeed, there were multiple instances of inmates having suspected drug overdoses that required Narcan to administered prior to the morning of August 11, 2021. [Exhibit D, RPDC Case File, p. 26 ("Due to recent **incidents** involving **offenders** becoming **non responsive from possible drug use**, offender Townley was given (1) 4ml narcan dosage at approximately 0442.")]. When incidents of suspected overdoses occurred, that information was discussed up the chain of command at the RPDC. [Exhibit A, Deposition of Bradley Salard, p. 33:2-18].

**II.    The RPDC deputies were negligent in their search of Exavier James which allowed fentanyl to be brought into the RPDC DC1 facility.**

Jason Marler was booked into the Rapides Parish Detention Center on June 6, 2021, and housed in the DC1 building. [Exhibit E, RPDC Case File, p. 108]. DC1 is one of three housing units for inmates under the care of the Rapides Parish Sheriff's Office and is designated for housing pre-trial detainees. Jason Marler was housed in dorm 583 which has a capacity of approximately thirty inmates. Jason Marler had a history of substance abuse that was ongoing when he was booked into the RPDC DC1 facility in 2021. [Exhibit F, Deposition of Chantelle Marler, p. 45:16-19].

Exavier James was booked into the Rapides Parish Detention Center on August 2, 2021 after turning himself in, and was also housed in DC1. [Exhibit G, RPDC Case File, p. 121]. James made it through the booking and processing at DC1 with fentanyl hidden in a hole in shoe which

3

was undetected by the RPDC deputies who searched him upon arrival. Exhibit H, RPDC Case File, RPDC 31. James was originally housed in dorm 508.

III.     **The RPDC Deputies brought Exavier James to Dorm 583 without searching him which allowed James to distribute Fentanyl to Jason Marler and two other inmates who all overdosed merely hours after the deputies brought James to the dorm.**

Exavier James was transferred to dorm 583 on the night of August 10, 2021 Exhibit H, RPDC Case File, RPDC 31. The RPDC deputies who transferred James to dorm 583 did not search James before introducing him to the dorm which allowed James to transport the fentanyl to dorm 583 by putting the drugs in his pants. Exhibit H, RPDC Case File, RPDC 31. The deputies were following the custom and policy set in place by Sheriff Wood that only required deputies to search inmates being transferred from one living area to another if the deputies suspected the inmates had contraband. [Exhibit A, Deposition of Bradley Salard, pp. 23:12 – 24:1].

IV.     **Ronnie Townley was found overdosed at 4:30 am, administered two doses of Narcan which revived him, and was taken to a local hospital where he made a full recovery.**

At approximately 4:30 am on August 11, 2021, RPDC deputies were made aware that an inmate was down in dorm 583 and was unresponsive. [Exhibit I, RPDC Case File, pp. 21-26]. RPDC deputies took the inmate identified as Ronnie Townley out of the dorm and into the hallway. [*Id.*]. Townley was noted to be blue in the face and neck, his eyes were rolled in the back of his head, and his oxygenation levels were in the low 30's. [*Id.*, at p.24]. Once the RPDC deputies moved Townley into the hallway, oxygen was administered, and he was connected to an AED device but no shock was advised by the machine. [*Id.*] Then "due to recent incidents involving offenders becoming nonresponsive from possible drug use," RPDC Sergeant Sasser administered a single 4ml dose of Narcan to Townley "in case of a possible drug overdose." [*Id.*, at p. 26]. After the first dose of Narcan was administered, Townley oxygen level began to rise. A second dose of

4

Narcan was given to Townley which resulted in Townley's color coming back and his oxygen level reaching 97%.

EMT's arrived and transported Townley to Rapides Regional Medical Center. Townley survived the incident. [*Id.*]. Townley was transported to the hospital at approximately 5:00 am on August 11, 2021, and the RPDC deputies had a shift change approximately 15 minutes after Townley departed the detention center. [Exhibit B, Deposition of Matthew Dubois, pp. 66:3 – 66:7].

V.    **The RPDC knew, or had a reasonable suspicion, that Townley had overdosed at 4:30 am but did not investigate to determine where he obtained the drugs from, whether any drugs remained, or how the drugs were brought in.**

Deputy Brad Salard was one of the deputies coming on shift the morning of August 11, 2021. [Exhibit A, Deposition of Bradley Salard, p. 9:3 – 7]. During the shift change, Deputy Salard was made aware that Ronnie Townley had been found overdosed just prior to Salard's arrival at 4:30 am that morning. [*Id.*, at p. 32:13-18; p. 41:17-23]. Even though the deputies were aware that an overdose had just occurred, no investigation was done into whether Townley had overdosed, where he obtained the drugs, or whether drugs remained in Dorm 583. [Exhibit B, Deposition of Matthew Dubois, pp. 65:19 – 66:2; Exhibit A, Deposition of Bradley Salard, p. 32:13 – 33:1; p. 40:21 – 41:23].

Video surveillance footage from inside Dorm 583 shows that moments after Townley was removed from the dorm, an inmate, believed to be Jonathon Gibson, in white t-shirt and beanie cap climbs up on a top bunk, pulls something (believed to be fentanyl) from arm pit, and attempts to hide it in something that is removed from the ceiling of the dorm. [Def. Mtn. Summ. Jmt., Exhibit 6, Video Event20210811043610052-Townley.avi, at 04:00]. The offender believed to be

Gibson is unable to accomplish his objective so he takes the substance and gets off of the bunk with the substance believed to be fentanyl on his person. [*Id.*].

Had the deputies searched the dorm as they admittedly should have done and reviewed the security footage from Townley's incident and the moments immediately after, they would have seen the offender attempting to hide drugs and keep them on his person. [*Id.*, at p. 38:2-8; Def. Mtn. Summ. Jmt., Exhibit 6, Video Event20210811043610052-Townley.avi, at 04:00].

**VI.    In addition to failing to remove the fentanyl that was blatantly shown to be in Dorm 583, the RPDC deputies did not administer Narcan to Jason Marler when he was found unresponsive at approximately 7:30 am on August 11, 2021.**

Approximately two hours after shift change at 7:33 am that morning, deputies were alerted to another inmate "not breathing" in dorm 583. [Exhibit J, RPDC Case File, p. 11]. RPDC Deputy Williams entered the dorm and saw an inmate performing chest compressions on Jason Marler. Deputy Williams left the dorm to call for an ambulance while another deputy radioed for help. Deputy Salard entered the dorm and found Marler with another inmate trying to wake him. [Exhibit K, RPDC Case File, p. 19]. Deputy Salard noted that Marler was unresponsive and appeared purple in color. [*Id.*]. Deputy Salard pulled Marler into the hallway with help from another inmate and turned over care to medic Steven Sibley who began administering CPR. [*Id.*]. Jason Marler was never administered Narcan by any deputy at the detention center. [Exhibit L, RPDC Case File, pp. 11, 13, 15, 17, 20].

As Salard was pulling Marler out of 583, he heard another deputy yell that another inmate was down. Salard went back into 583 and pulled the second inmate identified as Jonathon Gibson into the hallway next to Marler. [*Id.*]. Another deputy left the scene to retrieve the AED machine, and ambu bag, and Narcan. [*Id.*]. At 7:39, Gibson was given a dose of Narcan. At 7:40, the AED was placed on Marler but no shock was advised. [*Id.*]. At 7:42, Marler was administered oxygen.

At 7:44, Gibson vomited, and at 7:46, Gibson was given a second dose of Narcan. [*Id.*]. At 7:47, EMTs arrived on scene and took over the care of both inmates. At 8:03, Gibson was taken by ambulance to St. Francis Cabrini Hospital. [*Id.*] At 8:20, Marler was taken by ambulance to Rapides Regional Medical Center. Gibson survived the incident. Jason Marler died on August 14, 2021. [Exhibit M, RPDC Case File, p. 149-158].

On August 12, 2021, Rapides Parish Sheriff Office detectives interviewed Exavier James and two other inmates who were housed in dorm 583, Jimmy Boss and James Goff as part of the investigation into the three overdoses that occurred the previous morning. James admitted to bringing the fentanyl into the jail when he turned himself in by hiding it in his shoe, he admitted to bringing the fentanyl with him into dorm 583 by putting the drugs in his pants during the transfer and admitted to distributing the drugs to several other inmates. [Exhibit N, RPDC Case File, p. 44 – 48].

Chantelle Marler as Jason Marler's wife filed her complaint with the United States District Court for the Western District of Louisiana on August 5, 2022 individually and on behalf of her minor daughter, HLM. [R. Doc. 1]. Mrs. Marler alleged Sheriff Wood violated Mr. Marler's Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 for failing to take steps to alleviate the risk of Mr. Marler being exposed to drugs as a result of inadequate policies implemented by Sheriff Wood. [*Id.*, at ¶¶ 23 – 43]. Mrs. Marler also alleged that Sheriff Wood was vicariously liable for the negligent acts of deputies under state law. [*Id.* at ¶¶ 44-47].

Defendant now moves for summary judgment, alleging no genuine issues of material fact exist as to all of Mrs. Marler's claims against him, state and federal alike. Plaintiff now demonstrates through sufficient summary judgment evidence that genuine issues of material fact exist as to whether Sheriff Wood did violate Mr. Marler's constitutional rights under the Fourteenth

Amendment and as to whether Sheriff Wood and his deputies were negligent in preventing the death of Jason Marler. For the reasons set forth in this memorandum, Defendant's Motion for Summary Judgment should be denied.

## **LAW AND ARGUMENT**

**I.** **Plaintiff's claims of Constitutional violations under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983**

Plaintiff will first address Defendant Wood's conclusory allegations that Sheriff Wood is entitled to judgment as a matter of law as it pertains to Plaintiff's federal claims against Sheriff Wood for violating Jason Marler's Fourteenth Amendment right to be free from unreasonably dangerous conditions of confinement and to not be shown deliberate indifference for his serious medical needs. Sheriff Wood's assertions are inaccurate and insufficient to meet his burden on summary judgment. As such, Defendant's motion should be denied for the reasons set forth below.

**A.** **Sheriff Wood must put on sufficient evidence to satisfy his burden of proving that there is no genuine issues of material facts regarding whether Sheriff Wood violated Jason Marler's Fourteenth Amendment rights because of his policies and customs during Mr. Marler's detention.**

Federal and state law provide that summary judgment is appropriate only when there is no genuine issue of material fact such that the mover is entitled to judgment as a matter of law. *Waggoner v. Garland*, 987 F.2d 1160 (5th Cir. 1993); Fed. R. Civ. Proc. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury **could** return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505; 91 L.Ed. 2d 202 (1986); *Batiste v. Webre*, 00-323 (La. App. 3 Cir. 11/27/00); 774 So. 2d 1035. (emphasis added). Indeed, "[a]n issue is genuine if reasonable persons could disagree." *Chastant v. Chastant*, 13-1402, pp. 5-6 (La.App. 3 Cir. 4/23/14), 138 So.3d 801, 805, *writ denied*, 14-1508 (La. 10/22/14), 151 So.3d 605 quoting W. Schwarzer, *Summary Judgment Under the Federal*

8

*Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 481 (1983). Further, only when reasonable minds must inevitably conclude that the mover is entitled to judgment as a matter of law is summary judgment appropriate. *Batiste v. Webre*, 00-323 (La. App. 3 Cir. 11/27/00); 774 So. 2d 1035. The court must find all justifiable inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255; *Menard v. City of Lafayette*, 01-4 (La. App. 3 Cir. 5/23/01), 786 So. 2d 354.

Here, Mrs. Marler alleged in her complaint that Sheriff Wood violated Jason Marler's Fourteenth Amendment right to be free from dangerous conditions of confinement and to not have his serious medical needs met with deliberate indifference when he failed to implement effective policies to prevent illicit drugs from entering the RPDC DC1, and from being disseminated to other inmates despite knowing that drugs entering and moving within the facility and that the distribution of those drugs was resulting in dangerous and life-threatening overdoses. [Doc. 1, ¶¶ 23 – 27].

The moving party must show "that there is an **absence of evidence to support the non-moving party's cause**." *Celotex Corporation v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986) (emphasis added). The party asserting that a fact cannot be genuinely disputed must support the assertion by citing to particular parts of record, including depositions, documents, and affidavits; or by showing that the materials cited do not establish the presence of a genuine dispute. Fed. R. Civ. Proc. 56(c). If the moving party satisfies that burden, then the non-moving party must present "specific facts" showing a genuine issue of material fact for trial. *Matsushita Elec. Indus. Corp. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed. 538 (1986). However, if the moving party fails to satisfy its initial burden, regardless of the non-movant's response, summary judgment must be denied. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th

9

Cir. 1994). The court resolves all factual controversies in favor of the non-movant, but only when there is an actual controversy, that is, when both parties have submitted **evidence** of contradictory facts**.** *Id.* Conclusory allegations, unsubstantiated assertions, or metaphysical doubt as to the material facts is insufficient to satisfy the movant's burden. *Id.*

Thus, Defendant must demonstrate to the court that records is absent of factual support for Mrs. Marler's claim or point to specific facts in the record that support their assertion that no there is no genuine dispute satisfy his burden. Here, Defendant Wood has not presented any evidence to refute that he knew that drugs were being brought into his facility and disseminated amongst the inmates, nor has he demonstrated that he lacked knowledge that multiple other inmates had been given Narcan for suspected drug overdoses before August 11, 2021. *See Farmer v. Brennan*, 511 U.S. 825, 844-45, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Defendant Wood has not presented any evidence that he took any reasonable measures to remedy the problem of dangerous drugs entering the DC1 facility or to remedy the distribution of those drugs to other inmates after they are brought in. *See Id.,* at 845. Consequently, Defendant Wood has failed to meet his burden on summary judgment with regard to Mrs. Marler's Fourteenth Amendment claim. *See Little*, 37 F.3d at 1075 (5th Cir. 1994) *supra.* Thus, his motion should be denied.

**B. <ins>Plaintiff has brought sufficient summary judgment evidence to prove that genuine issues of material fact exist as to whether Sheriff Wood's policies and customs violated Jason Marler's Fourteenth Amendment right.</ins>**

For liability to attach to Sheriff Wood, Plaintiff must show that Sheriff Wood violated a federal right that was clearly established at the time of the violation such that the officer was on notice of the unlawfulness of his conduct. *Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022). Cases involving fundamentally similar facts are not always necessary to provide the fair warning that officers require. *Mullinex v. Luna*, 577 U.S. 7, 11, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015). Here,

Plaintiff sets forth ample evidence that establishes that genuine issues of material fact exist as to whether Sheriff Wood maintained his ineffective policy related to searching inmates inside of the DC1 facility despite knowledge that the policy was not protecting the inmates from exposure to contraband and was resulting in multiple other overdoses.

   a. **Mr. Marler's right to be housed in a reasonably safe environment and to not have his serious medical needs related to his opioid addiction met with deliberate indifference were clearly established rights that have been consistently recognized by the United States Fifth Circuit and the United States Supreme Court.**

Sheriff Wood's duty to provide humane conditions of confinement to Mr. Marler while he awaited trial, which included taking reasonable measures to guarantee the safety of Mr. Marler and the other inmates were clearly established at the time of Mr. Marler's detention and death. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). It has been well-established that the Eighth and Fourteenth amendments require "that inmates be furnished with the basic human needs, one of which is "reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (citing *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–1006, 103 L.Ed.2d 249 (1989)). Furthermore, Mr. Marler had a clearly established right under the Fourteenth Amendment to not have his serious medical needs met with deliberate indifference by Sheriff Wood. *Thompson v. Upshur Cnt'y,* 245 F.3d 447, 457 (5th Cir. 2001).

   b. **Sheriff Wood's custom of not searching inmates whenever they were moved from one area of the jail to another despite knowledge of several other incidents of inmates overdosing on fentanyl created a dangerous condition and showed deliberate indifference to Mr. Marler's serious medical need due to his addiction.**

To succeed against Sheriff Wood, Mrs. Marler is required to show (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom. *Monell v. Dep't of Soc.*

11

*Servs. Of City of New York,* 436 U.S. 658, 694,, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To show that the prevention of harm constituted an unreasonably dangerous condition of confinement, the Plaintiff must show that the conditions posed a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970,  128 L.Ed.2d 811 (1994). When a policymaker fails to adopt or adjust a policy **when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights**, the failure amounts to deliberate indifference. *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d. 412 (1989) (emphasis added)). Indeed, officials must not ignore conditions of confinement that are sure or very likely to cause serious illness or death. *Helling v. McKinney*, 509 U.S. 25, 33,  113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

     i.       **Sheriff Wood implemented a custom of not searching inmates who were being moved within the jail unless an officer had suspicion that the inmate had contraband on him that was shown to be ineffective in controlling to distribution of contraband within DC1.**

It is undisputed that Sheriff Wood was the official charged with implementing the policies and procedures at the RPDC facilities. [Exhibit A, Deposition of Bradley Salard, p. 17:23 – 18:-5]. Thus, Sheriff Wood was responsible for changing policies that were shown to be ineffective in protecting the safety of inmates and ineffective in addressing the serious medical needs of inmates. *See Rhyne* 973 F.2d at 392. The evidence also establishes that Sheriff Wood's and RPDC's policy was to not search inmates when moving inside of the facility from one living area to another, but to only conduct searches of inmates when the deputies suspected that the inmate "has something." [Exhibit A, Deposition of Bradley Salard, pp. 23:12 – 24:1]. Deputy Dubois, however, was unaware of the RPDC's policy related to searching inmates when they are moved internally and testified that he had not received any training on when to conduct searches of inmates being moved internally. [Exhibit B, Deposition of Matthew Dubois, p. 48:6-21]. Deputy Dubois testified:

12

Q:    Did you receive training from the Sheriff's Office or the detention center on what to do when taking an inmate from one dorm to another?

A:    No formal training, no, sir.

Q:    Is there a policy at the jail that you're aware of to search an inmate when they're being taken from one dorm to another?

A:    I know it's good practice. I can't speak to a policy written.

Q:    What about an informal policy where you were told, 'make sure you do this every time when an inmate is transferred from one dorm to another?'

A:    Like I said, it's a good practice. I don't know. I don't quite remember them actually saying that, 'hey, you should do this.' *Id.*

Thus, not only were Sheriff Wood's policies deficient, but they were also poorly communicated and implemented.

**c.    <u>Sheriff Wood recognized drug addiction as a serious medical need and RPDC knew that fentanyl was a dangerous drug that could kill if inmates were exposed to it and, thus had a duty to protect Mr. Marler from being exposed to it while he under Sheriff Wood's care.</u>**

Sheriff Wood's duty under the Fourteenth amendment to provide a reasonably safe environment included protection from being exposed to Fentanyl while being detained in his facility. Sheriff Wood and RPDC recognized in their own policies that a significant number of the jail population are known to have substance addictions, and were aware of the deadly nature of Fentanyl. [*See* Exhibit C, (RPSO/CDP&P 93-94, RPDC Policies and Procedures: H-2200 Health Care Medically Supervised Withdrawal and Treatment,) ("Discussion: Significant percentages of offenders have a history of alcohol and/or other drug abuse. Approved by Mark Wood, Sheriff.")]. RPDC knew that inmates would try to smuggle fentanyl into their facility, that Fentanyl was dangerous, and could cause an overdose if ingested. [Exhibit A, Deposition of Bradley Salard, p. 16:4 – 18:5; Exhibit B, Deposition of Matthew Dubois, p. 27:5-19, 34:19-22]. RPDC also knew that inmates would attempt to transport contraband, including drugs, from one living area to another. [Exhibit B, Deposition of Matthew Dubois, p. 50:9-13].

13

Indeed, Sheriff Wood cannot claim that he was unaware of the dangers of Fentanyl or that he did not recognize the obvious need to protect his inmates from exposure to Fentanyl when his own policies and deputies explicitly address the danger posed by Fentanyl and drug addiction. The prevalent nature of opioid addiction among inmates who were housed in DC1 as evidenced by Deputy Salard and Deputy Dubois's testimony supports Plaintiff's assertion that Sheriff Wood had duty to have adequate policies and procedures in place to ensure that inmates like Mr. Marler were not exposed to the highly addictive and exceedingly deadly drug while incarcerated.

Opioid abuse disorder has been widely recognized as a serious medical condition. *See* 42 C.F.R. Part 8; *see also* Exhibit C, Policy H-2200, *supra.* As noted, Sheriff Wood's own policies recognized that "significant percentages of offenders have a history of alcohol and/or other drug abuse." [Exhibit C, RPDC Policies and Procedures: H-2200 Health Care Medically Supervised Withdrawal and Treatment (RPSO/CDP&P 93-94)]. Consequently, Mr. Marler's addiction was a serious medical condition, and he had a right to be free from exposure to deadly drugs like Fentanyl while he awaited trial in Sheriff Wood's facility. As described more fully below, Sheriff Wood showed deliberate indifference to Mr. Marler's addiction when he failed to implement changes to his custom the obviously substantial risk that the custom was ineffective and would inevitably lead to continued overdoses.

i. **Plaintiffs can show through compelling circumstantial evidence that reasonable jurors could find that Sheriff Wood knew, or should have known, that there were multiple incidents of overdoses from opioids before August 11, 2021, showing this his custom searching practices were insufficient and creating a dangerous condition for the inmates.**

As noted *supra*, Sergeant Salard and Deputy Dubois acknowledged that both were aware that Fentanyl was threatening to enter the facility, that Fentanyl was dangerous, and that it could kill an inmate if they ingested too much. Moreover, in an incident report from the first overdose

14

incident at 4:30 am on August 11, 2021, Sergeant Sasser noted that there had been multiple prior incidents of inmate overdoses that required the administration of Narcan. [Exhibit D, RPDC Case File, p. 26) ("Due to recent **incidents** involving **offenders** becoming **non responsive from possible drug use**, offender Townley was given (1) 4ml narcan dosage at approximately 0442."). Sergent Salard testified in his deposition that there was an awareness at the RPDC that opioid overdoses were an issue that required the facility to keep Narcan available. [Exhibit A, Deposition of Bradley Salard, p. 43:22 – 44:5]. Furthermore, Sergeant Salard testified that when opioid overdoses occur, that information is discussed up the chain of command at the RPDC. [*Id*., at p. 33:2-18].

Consequently, plaintiff can show through circumstantial evidence that Sheriff Wood knew that opioid overdoses were a persistent problem before Exavier James was placed in Dorm 583 and distributed the fentanyl that killed Jason Marler through the testimony of his deputies. Based on Sergeant Sasser's comment in his incident report and the testimony of Sheriff Wood's deputy, a reasonable juror could conclude that Sheriff Wood knew, or should have known, opioids were being disseminated amongst inmates that was leading to overdoses prior to Mr. Marler's death. Reasonable jurors would also likely conclude that the prevalence of opioids and opioid-related overdoses created an unreasonably dangerous condition of confinement. Additionally, reasonable minds could differ as to whether maintaining a policy intended to control contraband that was shown to be ineffective and putting inmates in danger of dying amounted to deliberate indifference to inmates known to be susceptible to addiction.

ii.     **Plaintiff has brought forth expert testimony from Paul Adee as evidence that Sheriff Wood's custom created an unreasonably dangerous condition that is supported by the testimony of Sheriff Wood's own deputy.**

15

Plaintiff's expert, Paul Adee, has been identified as an expert in jail and prison administration and policy and procedure formation. [Exhibit O, Expert Report of Paul Adee; Exhibit P, CV of Paul Adee]. Mr. Adee testified that he has over 32 years of experience as a correctional officer, including serving as a major/division commander and has experience developing policies, procedures, and post orders to ensure compliance with constitutional standards[Exhibit O, Expert Report of Paul Adee, pp. 2-3; Exhibit P, CV of Paul Adee].

Mr. Adee explained in his report that Sheriff Wood had a duty to keep the inmates in his charge safe as a fundamental tenant of the profession and must develop and implement adequate policies and procedures to that end. [Exhibit O, expert report of Paul Adee, p. 8]. Mr. Adee's provides that contraband, and its movement within a correctional facility threaten the health and safety of inmates and staff, and that contraband is typically moved from area to another once it has been introduced to the facility. [*Id.,* at p. 9].

Mr. Adee testified in his deposition and in his report that Sheriff Wood's policy of not searching inmates any time they are transferred internally from one living area to another was insufficient and created an unreasonably dangerous condition for Mr. Marler. [Exhibit O, Expert Report of Paul Adee, p. 9, 10; Exhibit Q, Deposition of Paul Adee, pp 47:21 – 50:16; p. 53:7 – 24]. In fact, Mr. Adee points out that RPDC's own POST orders state that shift corporal, shift sergeants, and zone 3 deputies are charged to "control the introduction of contraband by searching offenders as required **entering and/or leaving the housing unit or facility.**" [Exhibit R, RPDC Post Orders, (RPDC1/PO6; RPDC1/PO13; RPDC1/PO26)].

Sheriff Wood, therefore, recognized the importance and effectiveness of consistently searching inmates whenever they enter or leave a housing unit by including them in his POST orders. Yet, Sheriff Wood continued the ineffective and indifferent custom of not searching

16

inmates between living areas despite knowing that contraband was being disseminated amongst the inmates causing multiple overdoses requiring administration of Narcan.

Moreover, RPDC's own deputy, Deputy Dubois agreed with Mr. Adee that searching inmates whenever they are taken from one area of the jail to another is a superior policy or custom that would help prevent contraband from being spread throughout the jail. [Exhibit B, Deposition of Matthew Dubois, pp.48:6 – 50:7]. Specifically, Deputy Dubois stated:

Q:   You told me it was good practice to check and search an inmate when they're being transferred. Why is it good practice?
A:   the possibility of contraband being transferred from one dorm to another, weapons and stuff like that.
Q:   And the search would – searching those inmates from one dorm to another might lead to the prevention of contraband being taken from one dorm to another?
A:   Yes, sir.
Q:   Is that something that has happened before, where contraband has been taken from one dorm to another by an inmate?
A:   **I'm sure. I mean, not that I can think of right off, but yeah, I'm sure it's happened**.
Q:   If there's not a policy in place to search an inmate when they're being transferred from one dorm to another, that's a system problem at the jail that could lead to contraband being taken from one dorm to another, right?
A:   Yeah. [*Id.*, at pp.49:8 – 50:7 (emphasis added) (Mr. Calvit's objection to form omitted)].

Deputy Dubois went on to testify that Exavier James should have been searched when he was taken from Dorm 508 and brought to Dorm 583, and that the overdoses on August 11, 2021, and Mr. Marler's death would have been prevented if the proper search of Exavier James had been done. [Exhibit B, Deposition of Matthew Dubois, pp. 85:11-20; 93:4-92].

iii.   **Plaintiff sets forth sufficient evidence to show that a genuine issue of material fact exists as to whether Sheriff Wood's custom was the moving force behind the unreasonably dangerous condition that led to Mr. Marler's death.**

Mr. Adee's report shows that the inadequate and ineffective policies and customs by Sheriff Wood violated correctional standards of care that created a dangerous condition which

17

resulted in Jason Marler's incident and subsequent death. [Exhibit O, Expert Report of Paul Adee, p. 13]. Furthermore, Deputy Salard's testimony supports that the ineffective policy by Sheriff Wood was the moving force behind Mr. Marler's death. According to Deputy Dubois, the August 11th incidents would have been avoided if the proper search of Exavier James had been done:

> Q:   The incident with the three inmates on August 11, 2021 would have been prevented if the deputies who transferred Exavier James from Dorm 508 to 583 were properly trained on how to search inmates when they're being transferred, right?
>
> A:   Yes, sir. [Exhibit B, Deposition of Matthew Dubois, p. 92:4-11 (Objection to form by Mr. Calvit omitted)].

Therefore, based on the testimony of Plaintiff's expert and Sheriff Wood's deputy, Plaintiff has presented sufficient evidence to show a genuine issue of material fact exists as to whether Sheriff Wood's custom was the moving force behind the unreasonably dangerous condition and deliberate indifference to Mr. Marler's addiction. Thus, Sheriff Wood's motion as to Plaintiff's claims pursuant to 42 U.S.C. § 1983 should be denied.

**C.  The reliance of Defendant on the detention center's ACA accreditation is not evidence that his policies and customs were constitutionally compliant.**

The US Supreme Court and Fifth Circuit has soundly rejected Defendant's argument that the detention center's ACA accreditation proves this the policies and customs that were in place were compliant with the Constitution's requirements against unreasonably dangerous conditions of confinement and prohibition of deliberate indifference to serious medical needs. *Bell v. Wolfish* 441 U.S. 520, 543, n. 27 (1979); *Gates v. Cook,* 376 F.3d 323, 337.  In *Gates,* 376 F.3d 337, the Court found the same argument posited by Defendant as "absurd" and that courts should not "subvert their own judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards." The ACA's recommendations "do not establish the constitutional minima" and "is not per se evidence of constitutionality." *Bell*, 441 U.S. at 543; *Gates*, 376 F.3d at 337. The

relevant inquiry is not whether the RPDC met the ACA's accreditation standards, but whether Sheriff Wood's policy and custom to not search inmates during internal transfers was deliberately indifferent to a known and obvious risk of serious harm.

**II.    Plaintiff brings forth sufficient summary judgment evidence to show genuine issues of material fact exist as to whether the RPDC deputies were negligent for which Sheriff Wood is vicariously liable.**

Plaintiff now addresses Defendants entirely unsupported assertion that Plaintiff cannot show genuine issues of material fact exist as to whether the RPDC were negligent for which Sheriff Wood is vicariously liable.

"Negligence" has been defined by the Louisiana Supreme Court as "conduct which falls below the standard of care established by law for the protection of others against an unreasonable risk of harm." *Detraz v. Lee*, 05-1263 (La. 1/17/07), 950 So.2d 557, 562. The standard negligence analysis employed in determining whether to impose liability in negligence cases is the duty/risk analysis. *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So.2d 318, 321.

Under the duty/risk analysis, the plaintiffs must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiffs' injuries (cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiffs' injuries (the scope of duty element); and, (5) proof of actual damages (the damages element). *Farrell v. Circle K Stores, Inc.,* 22-00849 (La. 3/17/23), 359 So.3d 467, 473.

**A. Sheriff Wood and his deputies owed Mr. Marler a duty to protect him from unreasonably dangerous conditions, to act on clear evidence of drugs being present in Dorm 583 before he overdosed, and to provide life-saving measures when he was found unresponsive in his cell.**

19

The threshold question in any negligence action is whether the defendant owed the plaintiff a duty. *Hester v. Walker*, 20-01278 (La. 5/13/21), 320 So.3d 362, 367. Whether a duty is owed is a question of law.  *Id.* Duty can be established by statute, jurisprudence, or from general principles of fault. *Farrell*, 359 So.3d at 473.

The cases cited above establish that Sheriff Wood and his deputies were charged with providing a reasonably safe environment for the RPDC inmates, including Mr. Marler. *See Farmer* and *Helling, supra*; Exhibit O, expert report of Paul Adee, p. 8.  That duty extends to protecting inmates from exposure to addictive and deadly drugs while under their care. [Exhibit O, expert report of Paul Adee., p. 9]. Moreover, Sheriff Wood and his deputies had an obligation to provide reasonable medical care to those over whom they had custody due to incarceration. *Ceasar v. Hebert*, 05-1195 (La.App. 3 Cir. 4/5/06), 926 So.2d 139, 143*, citing Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The duty to provide reasonable medical care encompasses the risk that an inmate will require life-saving measures while in custody of the government. *Moreau v. State Through Dept. of Corrections,* 333 So.2d 281, 284 (La.App. 1 Cir. 4/24/76). Sheriffs and their deputies owe a duty to provide reasonable medical care regardless of the origin of the injury or condition requiring care. *Id.*

Plaintiff's expert, Jeff Clark, who has extensive experience training deputies on providing medical care in detention facilities and is familiar with how deputies are supposed to respond to opioid overdoses, provided an expert report and deposition testimony in this matter. [Exhibit S, Expert report of Jeff Clark, RN; Exhibit T Deposition of Jeff Clark, p. 9:16 – 11:3; p. 26:5 – 27:2]. Mr. Clark explained that the Advanced Life Support guidelines state that Narcan is the reversal agent of choice in opioid overdose and is highly recommended for early use with overdose symptoms. [*Id.*]. Defendant's expert, Deborah Ash, testified that detention centers must properly

20

administer Narcan when someone experiences an overdose. [Exhibit U, Deposition of Deborah Ash, p. 16:20-25].

**B. The evidence is overwhelming that the RPDC deputies breached their duty to provide a safe environment and remove the drugs from Dorm 583 in addition to breaching their duty to administer Narcan to Mr. Marler when he was found unresponsive.**

As noted above, the RPDC deputies knew that fentanyl was dangerous and could cause an overdose if an inmate took too much of it. [Exhibit A Deposition of Bradley Salard, p. 16:4 – 18:5; Exhibit B, Deposition of Matthew Dubois, p. 27:5-19, 34:19-22]. Moreover, the RPDC deputies knew that Ronnie Townley had overdosed and was given Narcan three hours before Jason Marler was found unresponsive. [Exhibit A, Deposition of Bradley Salard at p. 32:13-18; p. 41:17-23]. Both Sergeant Salard and Deputy Dubois testified that dorm 583 should have been searched after Townley was taken out for what was suspected to be an opioid overdose. Thus, a reasonable juror could find, based on the evidence, that the RPDC deputies breached their duty to Mr. Marler by failing to search dorm 583 after the 4:30 incident.

Moreover, Plaintiffs expert Jeff Clark testified in his report and deposition that the failure to give Narcan to Mr. Marler was a breach of duty. [Exhibit S, Expert report of Jeff Clark, R.N.; Exhibit T, Deposition of Jeff Clark, p. 38:1-40:17]. Mr. Clark explained that the deputies failure to give Marler Narcan while giving the other two inmates Narcan on the same day is further proof that the deputies acted below standard in their response to Mr. Marler. [Exhibit T, Deposition of Jeff Clark, p. 42:23-43:16). Thus, a genuine issue of material fact exists as to whether the RPDC deputies breached their duty to Mr. Marler when they failed to administer Narcan to him when he unresponsive.

**C. Genuine issues of fact exist as to whether the RPDC deputies' failure to search dorm 583 and failure to administer Narcan were a cause in fact of Mr. Marler's overdose and death.**

21

Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about the harm. *Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co.*, 242 La. 471, 137 So.2d 298 (La. 1962). If Mr. Marler's overdose and death would have happened irrespective of the RPDC deputies' negligence, then their conduct could not have been a substantial factor in causing Mr. Marler's overdose and death. *Id.*

Here, the testimony of Deputy Dubois and Sergeant Salard establish a genuine issue of fact as to whether Mr. Marler's overdose would have occurred if the deputies had investigated Townley's overdose by reviewing the security footage and searching the cell. Both Sergeant Salard and Deputy Dubois testified that the dorm should have been searched after the 4:30 incident. The security footage shows that if the deputies had reviewed it, they would have known who had the fentanyl allowing them to remove the drug from the cell hours before Marler ingested it and overdosed. Moreover, Plaintiff's expert Dr. Chad Heinen testified that the failure on the part of the deputies to administer Narcan caused Mr. Marler's death. [Exhibit V, Expert Report of Dr. Chad Heinen, [Exhibit W. Deposition of Dr. Chad Heinen, p. 44:3 -48:12]. Thus, a genuine issue of fact exists as to whether the RPDC deputies' negligence was a cause-in-fact of Mr. Marler's death.

**D. Reasonable jurors could find that the RPDC deputies were the legal cause of Jason Marler's overdose and death.**

Legal cause asks whether the risk of harm encountered by Mr. Marler falls within the scope of protection of the Defendants duty to investigate and root out drugs from his dorm and to administer Narcan to reverse the effects of an overdose. Undoubtedly, the risk of overdosing and dying is encompassed in the duty to root out drugs that are obviously in his cell and to administer a lifesaving medication that is specifically designed to counteract the effects of Fentanyl. Thus, a genuine issue of material fact exists for this issue.

**CONCLUSION**

For the above and foregoing reasons, plaintiffs pray that defendants' Motion for Summary Judgment should be denied.

Respectfully Submitted,
**THE TOWNSLEY LAW FIRM, LLP**

s/ *D. Grant Castillo*
**TODD A. TOWNSLEY, LSBA Roll No. 21095**
**D. GRANT CASTILLO, LSBA Roll No. 39833**
3102 Enterprise Blvd.
Lake Charles, Louisiana 70601
Telephone: 337-478-1400
Facsimile: 337-478-1577
grant@townsleylawfirm.com

and

s/ *Sean R. Guy*
**Sean R. Guy (MSB#100362)**
MCCRANEY MONTAGNET QUIN & NOBLE
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:    (601) 707-5725
Facsimile:    (601) 510-2939
sguy@mmqnlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 6th day of October 2025, a copy of the foregoing Memorandum In Opposition to Motion for Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Eli J. Meaux and H. Bradford Calvit with Provosty, Sadler, & deLaunay, APC by operation of the Court's electronic filing system.  I also certify that I have mailed by US Postal Service this filing to the following non-CM/ECF participants: none.

/s/ D. Grant Castillo
D. GRANT CASTILLO